# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

### VENUE: OAKLAND

# FILED

OCT 2 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

V.

CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD.; SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. a/k/a "Dong Fang International Containers"; CXIC GROUP CONTAINERS CO. LTD.; SINGAMAS CONTAINER HOLDINGS LTD.; BOLIANG MAI; TIANHUA HUANG a/k/a "T.H. Huang"; YONGBO WAN; QIANMIN LI; YUQIANG ZHANG a/k/a "James Zhang"; and VICK NAM HING MA a/k/a "Vick

DEFENDANT(S).

## INDICTMENT  CR 25 0311

YGR

15 U.S.C. § 1 – Conspiracy in Restraint of Trade:
Output Restriction and Price Fixing

A true bill.

_____ Foreman

Filed in open court this 2nd day of

October, 2025

_Ivy L. Garcia_  10/2/25
Clerk

Bail, $ Arrest Warrants for 6 individual defendants summons for corporate defendants

Hon. Donna M. Ryu, Chief Magistrate Judge

10/2/25

FILED

OCT 2 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. **CR 25 0311** YGR |
| Plaintiff, | VIOLATION: |
| v. | 15 U.S.C. § 1 – Conspiracy in Restraint of Trade: Output Restriction and Price Fixing |
| CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD.; SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. a/k/a "Dong Fang International Containers"; CXIC GROUP CONTAINERS CO. LTD.; SINGAMAS CONTAINER HOLDINGS LTD.; BOLIANG MAI; TIANHUA HUANG a/k/a "T.H. Huang"; YONGBO WAN; QIANMIN LI; YUQIANG ZHANG a/k/a "James Zhang"; and VICK NAM HING MA a/k/a "Vick Ma", | OAKLAND VENUE |
| Defendants. | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

## GENERAL ALLEGATIONS

### A. Overview

1. Millions of shipping containers crisscross the world's oceans each year, carrying billions of dollars of goods destined for American households. Many of these goods travel in what are called "standard dry containers"—non-refrigerated ("dry") shipping containers with standardized physical dimensions. Shipping lines, logistics companies, and container lessors spend billions of dollars per year on standard dry containers.

2. From at least 2019 through 2024, the six company conspirators—defendant CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD.; defendant SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. a/k/a Dong Fang International Containers; defendant CXIC GROUP CONTAINERS CO. LTD.; defendant SINGAMAS CONTAINER HOLDINGS LTD.; Co-Conspirator Company A; and Co-Conspirator Company B—together manufactured about 95 percent of the world's standard dry containers.

3. Amid the COVID-19 pandemic, delays beset shipping worldwide. American consumers suffered shortages of goods ranging from electronics to medical supplies. Inflation surged.

4. Meanwhile, from at least November 2019 through at least January 2024, the defendants and their co-conspirators agreed to restrict the output and fix the prices of standard dry containers. As a result of the conspiracy, the prices of standard dry shipping containers roughly doubled between 2019 and 2021. And while the global supply chain was in crisis, the dry container manufacturers reported their increased profitability.

### B. Defendants and Their Company Co-Conspirators

5. Defendant CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD. ("CIMC"), also known as 中国国际海运集装箱（集团）股份有限公司 in Chinese, was a publicly traded company, organized and existing under the laws of the People's Republic of China. CIMC was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

6. Defendant SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD., also known as 上海寰宇物流装备有限公司 in Chinese, was a company organized and existing under the

laws of the People's Republic of China. SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD. (hereinafter "DONG FANG") owned, managed, and did business as a brand of shipping containers called Dong Fang International Containers, also known as DFIC or DONG FANG. DONG FANG was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

7. Defendant CXIC GROUP CONTAINERS CO. LTD. ("CXIC") also known as 新华昌集团有限公司 in Chinese, was a company organized and existing under the laws of the People's Republic of China. CXIC was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

8. Defendant SINGAMAS CONTAINER HOLDINGS LTD. ("SINGAMAS") also known as 胜狮货柜企业有限公司 in Chinese, was a publicly traded company, organized and existing under the laws of Hong Kong in the People's Republic of China. SINGAMAS was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

9. Co-Conspirator Company A was a company organized and existing under the laws of the People's Republic of China. Co-Conspirator Company A was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

10. Co-Conspirator Company B was a company organized and existing under the laws of the People's Republic of China. Co-Conspirator Company B was engaged in the business of manufacturing dry shipping containers and selling them to customers in the United States and elsewhere.

11. This Indictment refers to CIMC, DONG FANG, CXIC, SINGAMAS, Co-Conspirator Company A, and Co-Conspirator Company B together as the "company conspirators."

12. Defendant BOLIANG MAI, also known as 麦伯良,[1] was employed by CIMC in various senior roles. From August 2015 through July 2020, MAI served as President and Chief Executive Officer ("CEO") of CIMC. From August 2020 through the rest of the period covered by this Indictment,

_____

[1] In this Indictment, the individual defendants' names are written in English with surnames after first names (as is conventional in English) but written in Chinese with surnames before first names (as is conventional in Chinese).

he served as Chairman and CEO of CIMC. MAI is believed to be a resident of the People's Republic of China.

13. Defendant TIANHUA HUANG, also known as 黄田化 and T.H. Huang, was employed by CIMC as Vice President. HUANG is believed to be a resident of the People's Republic of China.

14. Defendant YONGBO WAN, also known as 万永波, was employed by CIMC as General Manager of CIMC's Operation Management Center. WAN is believed to be a resident of the People's Republic of China.

15. Defendant QIANMIN LI, also known as 李前敏, was employed by DONG FANG as General Manager. LI is believed to be a resident of the People's Republic of China.

16. Defendant YUQIANG ZHANG, also known as 张钰强 and James Zhang was employed by CXIC as CEO. ZHANG is believed to be a resident of the People's Republic of China.

17. Defendant VICK NAM HING MA, also known as 馬南慶, 马南庆, and VICK MA, was employed by SINGAMAS as Marketing Director. MA is believed to be a resident of Hong Kong, People's Republic of China.

18. Various companies and individuals, not made defendants in this Indictment, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance thereof.

19. Whenever in this Indictment reference is made to any act, deed, or transaction of any company, the allegation means that the company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

C. **Shipping Containers**

20. The most common type of shipping container was a non-refrigerated container, also known as a "dry" container or "dry box". Dry containers were general-purpose enclosed boxes made of rust-retardant steel. Shipping lines, logistics companies, and retailers used dry containers to ship various goods across the world, including into, out of, and throughout the United States.

21. Dry containers were sold in both standard and non-standard dimensions. The four standard dimensions were: (1) 20-feet long at a shorter height; (2) 40-feet long at a shorter height; (3) 40-feet long at a taller height (called "high-cube"); and (4) 45-feet long at the high cube height.

**D.  The Conspirators Engaged in a Conspiracy to Restrict the Output and Fix the Prices of Standard Dry Shipping Containers**

22. At least as early as March 2019, several of the conspirators began discussing a scheme to restrict the output and fix the prices of standard dry shipping containers.

23. On or about November 14, 2019, YONGBO WAN and TIANHUA HUANG of CIMC, QIANMIN LI of DONG FANG, YUQIANG ZHANG of CXIC, and a co-conspiring executive of Co-Conspirator Company A ("Co-Conspirator Company A Executive 1") met at CIMC's headquarters in the city of Shenzhen. There, they agreed to restrict CIMC's, DONG FANG's, CXIC's, and Co-Conspirator Company A's output of standard dry shipping containers by various means, including:

a. Limiting the number of shifts and hours that each production line for standard dry containers could run per day;

b. Installing video surveillance on all dry container production lines to ensure that the companies did not exceed the agreed-upon limitations;

c. Not building any new container manufacturing factories; and

d. Establishing a fund that included a mechanism to penalize financially any cheating on the output-restriction agreement.

The goal of the agreement was to raise the price of standard dry shipping containers.

24. Although there were no representatives from SINGAMAS and Co-Conspirator Company B at the November 14, 2019 meeting at CIMC's headquarters in Shenzhen, the participants contemplated that SINGAMAS and Co-Conspirator Company B would join the output-restriction agreement later. Those companies did so by at least as early as March 2020.

25. By February 2020, CIMC circulated to CIMC, DONG FANG, CXIC, SINGAMAS, Co-Conspirator Company A, and Co-Conspirator Company B a draft contract titled Shenzhen Moon Gazing Equity Investment Fund, or "深圳市望月股权投资基金合伙企业（有限合伙）之合伙协议" in

Chinese (the "Moon Gazing Fund contract"), which, among other things, memorialized certain aspects of the output-restriction agreement.

26. In or around March 2020, the company conspirators held a ceremony where they signed a final version of the Moon Gazing Fund contract.

27. Throughout their conspiracy, the conspirators refined the operation of the output-restriction agreement. By September 2020, the conspirators agreed to restrict how many standard dry shipping containers the company conspirators would manufacture for particular customers, whom the conspirators referred to as "mainstream customers" or "mainstream clients." These customers included major U.S.-based container lessors, shipping lines, and logistics companies, in addition to container lessors, shipping lines, and logistics companies based in Europe, the People's Republic of China, and elsewhere.

28. From at least as early as September 2022 until at least as late as November 2023, the conspirators agreed to cap the total cargo volume of containers the company conspirators produced. On or about November 20, 2023, for example, VICK MA co-presented to other SINGAMAS executives the conspiracy's "Total Allowable capacity" and "allowable quota" for production—organized by each company conspirator and its factory lines. The image below is an excerpt from that presentation (with the names of Co-Conspirator Company A, Co-Conspirator Company B, and their factory lines redacted):

**• Dec allowable quota – 50 hours = 125,000 Teus for whole industry**

| | | Per hour capacity | Sep 2022 to Apr 2023 | May 2023 | Jun to Aug 2023 | Sep 2023 | Oct 2023 | Nov 2023 | Subtotal of Nov | % of Nov 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total Hours : | | 150 | 0 | 50 | 40 | 30 | 20 | | |
| | 1&2 成焦(AB合并) | 220 | 33,000 | 0 | 11,000 | 8,800 | 6,600 | 4,400 | | |
| | 3 新会A | 18 | 2,700 | 0 | 900 | 720 | 540 | 360 | | |
| | 4 新会B | 80 | 12,000 | 0 | 4,000 | 3,200 | 2,400 | 1,600 | | |
| | 5 温州 ZCMC (B LINE) | 56 | 8,400 | 0 | 2,800 | 2,240 | 1,680 | 1,120 | | |
| | 6 宁波 NCLE (A LINE) | 110 | 16,500 | 0 | 5,500 | 4,400 | 3,300 | 2,200 | | |
| | 7 苏州 SCBC (B LINE) | 78 | 11,700 | 0 | 3,900 | 3,120 | 2,340 | 1,560 | | |
| CIMC | 8 洋山 SYLE (B LINE) | 106 | 15,900 | 0 | 5,300 | 4,240 | 3,180 | 2,120 | 22,160 | 43% |
| | 9 太仓C | 110 | 16,500 | 0 | 5,500 | 4,400 | 3,300 | 2,200 | | |
| | 10 太仓B | 102 | 15,300 | 0 | 5,100 | 4,080 | 3,060 | 2,040 | | |
| | 11 青岛 QDCM (B LINE) | 90 | 13,500 | 0 | 4,500 | 3,600 | 2,700 | 1,800 | | |
| | 12 天津 TJCC (B LINE) | 70 | 10,500 | 0 | 3,500 | 2,800 | 2,100 | 1,400 | | |
| | 13 日照 RYC (B LINE) | 34 | 5,100 | 0 | 1,700 | 1,360 | 1,020 | 680 | | |
| | 14 大连 DCMC (B LINE) | 34 | 5,100 | 0 | 1,700 | 1,360 | 1,020 | 680 | | |
| | 15 广州 | 94 | 14,100 | 0 | 4,700 | 3,760 | 2,820 | 1,880 | | |
| | 16 青岛 DFQT (B LINE) | 72 | 10,800 | 0 | 3,600 | 2,880 | 2,160 | 1,440 | | |
| | 17 锦州 DFJZ (B LINE) | 94 | 14,100 | 0 | 4,700 | 3,760 | 2,820 | 1,880 | | |
| DFIC | 18 平湖 | 100 | 15,000 | 0 | 5,000 | 4,000 | 3,000 | 2,000 | 12,960.00 | 25% |
| | 19 锦州东 | 104 | 15,600 | 0 | 5,200 | 4,160 | 3,120 | 2,080 | | |
| | 20 锦州东北部 | 80 | 12,000 | 0 | 4,000 | 3,200 | 2,400 | 1,600 | | |
| | 21 连云港 DFLYG (B LINE) | 104 | 15,600 | 0 | 5,200 | 4,160 | 3,120 | 2,080 | | |
| | 22 太仓 TXIC (B LINE) | 70 | 10,500 | 0 | 3,500 | 2,800 | 2,100 | 1,400 | | |
| | 23 青岛 QXIC (B LINE) | 72 | 10,800 | 0 | 3,600 | 2,880 | 2,160 | 1,440 | | |
| CXIC | 24 泉州 | 104 | 15,600 | 0 | 5,200 | 4,160 | 3,120 | 2,080 | 8,120 | 16% |
| | 25 宁波 JXIC (A LINE) | 60 | 9,000 | 0 | 3,000 | 2,400 | 1,800 | 1,200 | | |
| | 26 宁波 | 100 | 15,000 | 0 | 5,000 | 4,000 | 3,000 | 2,000 | | |
| SINGAMAS | 27 苏州 | 68 | 10,200 | 0 | 10,000 | 2,720 | 2,040 | 1,360 | 2,480 | 5% |
| | 28 WF 1 | 56 | 8,400 | 0 | | 2,240 | 1,680 | 1,120 | | |
| | 29 | 90 | 13,500 | 0 | 4,500 | 3,600 | 2,700 | 1,800 | 3,600 | 7% |
| | 30 | 90 | 13,500 | 0 | 4,500 | 3,600 | 2,700 | 1,800 | | |
| | 31 | 100 | 15,000 | 0 | 5,000 | 4,000 | 3,000 | 2,000 | 2,000 | 4% |
| | Total Allowable capacity | | 384,900 | 0 | 132,100 | 102,540 | 76,980 | 51,320 | 51,320 | 100% |
| | Total (Sep 2022 to Nov 2023) | | | | 747,940 | | | | | |
| | Remarks | 10,000 | Special granted quota to produce TWN orders only (original 6,800 TEUS) | | | | | | | |

INDICTMENT                                    6

29. VICK MA's presentation, excerpted above, referenced the term "TEUs." TEU, an abbreviation of "twenty-foot equivalent unit," was a common unit for measuring cargo capacity in the shipping industry.

30. As agreed at the November 14, 2019 meeting, the conspirator companies also installed video-surveillance cameras at their factories to ensure that no company violated the agreed-upon output restrictions. In total, the conspirators installed about 87 cameras on 49 different container production lines at the company conspirators' factories.

31. The conspirators used the cameras to monitor compliance with the output restrictions. For example, in or around June 2021, YONGBO WAN of CIMC emailed TIANHUA HUANG of CIMC an audit of the company conspirators' production lines, including screenshots from the surveillance footage. Below is a screenshot of surveillance footage of Co-Conspirator Company A's factory that was included in the audit (with Co-Conspirator Company A's name redacted):



32. To facilitate communications about the output restrictions, the conspirators created a WeChat group and list of contacts at each company conspirator. Defendants YONGBO WAN of CIMC, TIANHUA HUANG of CIMC, QIANMIN LI of DONG FANG and YUQIANG ZHANG of CXIC were listed as contacts for their respective companies.

33. The conspirators expressed a preference for discussing the output restrictions in person so as "to avoid the suspicion of industry monopoly[.]" One such meeting took place in or around February 2023 between VICK MA of SINGAMAS, a co-conspiring executive of SINGAMAS ("Singamas Executive 1"), TIANHUA HUANG of CIMC, YONGBO WAN of CIMC, QIANMIN LI of DONG FANG, and YUQIANG ZHANG of CXIC.

34. Another in-person meeting took place in or around March 2024 at CIMC's Shenzhen headquarters. BOLIANG MAI of CIMC, YONGBO WAN of CIMC, TIANHUA HUANG of CIMC, a co-conspiring executive from DONG FANG ("Dong Fang Executive 1"), YUQIANG ZHANG of CXIC, VICK MA of SINGAMAS, and two co-conspirator executives from Co-Conspirator Company A ("Co-Conspirator Company A Executive 2" and "Co-Conspirator Company A Executive 3") met to discuss output "control mechanism[s]."

35. The conspirators also worked to halt the growth of smaller standard dry container manufacturers who were not part of the conspiracy. Starting at least as early as 2020 and continuing periodically throughout the conspiracy, the conspirators discussed how to respond to these smaller standard dry container manufacturers and gathered information on their output and customers.

36. On or around August 7 and 10, 2023, the conspirators discussed waging "war" against smaller manufacturers outside the conspiracy. The conspirators sought "to strike back by sentencing [*sic*] the price war against these small factories. [. . .] The aim is to signalize these small factories not to grab the orders in low price [*sic*] which violated the effort to stabilize the price[.]"

**E.      CIMC and DONG FANG Attempted to Expand the Conspiracy to Refrigerated Shipping Containers**

37. Shortly after the conspiracy began, CIMC and DONG FANG sought to expand it to refrigerated shipping containers (also known in the industry as "reefers").

38. Specifically, on or about May 15, 2020, TIANHUA HUANG of CIMC emailed the CEO of Company C ("Company C Executive 1")—a competing reefer manufacturer. In that email, TIANHUA HUANG stated that the standard dry container manufacturers had "reached a consensus and established industry self-discipline actions" to address, among other things, "overcapacity," and he suggested that "all standard reefer manufacturers, like the standard dry box manufacturers, shall

INDICTMENT                                      8

negotiate and communicate with each other, act together, follow the dry box practice, mainly including, (a) No capacity increase, (b) All standard reefer manufacturers run one shift only."

39. Company C Executive 1 declined the invitation, stating in writing that "any such coordination is strictly forbidden by the compliance policies" of Company C.

**F. Standard Dry Container Prices and Manufacturers' Profits Increased During the Conspiracy**

40. On or about December 13, 2019, CIMC Chairman BOLIANG MAI emailed his subordinates TIANHUA HUANG, YONGBO WAN, and a co-conspiring CIMC executive ("CIMC Executive 1") predicting that the price of 20-foot standard dry containers would rise to more than $2,000. MAI warned these subordinates not to forward his email.

41. From 2019 to 2021, the price of a standard dry 20-foot container more than doubled from roughly $1,600 to over $3,500. During this same period, the price of a standard dry 40-foot container more than doubled from roughly $2,800 to over $5,900; and the price of a standard dry 40-foot high cube container doubled from roughly $3,000 to over $6,000. From 2019 to 2022, the price of a standard dry 45-foot high cube container increased from $4,100 to over $5,730.

42. The profits of CIMC's container manufacturing business segment increased nearly one hundredfold from $137 million Chinese yuan in 2019 (about $19.8 million USD) to $1.99 billion yuan in 2020 (about $288 million USD) to $11.3 billion yuan (about $1.75 billion USD) in 2021.

43. Other company conspirators remarked on the profitability of the industry during the conspiracy. In or around May 2020, DONG FANG wrote to CIMC and praised how cooperation on the production of standard dry containers had restored profitability to the industry. And in or around January 2023, co-conspiring SINGAMAS executives wrote to each other that the entire industry profited from the conspiracy in 2021 and 2022.

**G. The Conspirators Tried to Conceal the Conspiracy**

44. Throughout the conspiracy, the conspirators took steps to conceal it. For example:

a. In or around October 2021, while preparing a presentation to SINGAMAS's board of directors, Singamas Executive 1 sent another co-conspiring SINGAMAS executive ("Singamas Executive 2") a draft slide deck for the meeting. The draft slides mentioned a "[m]anufacturing sector

official and unofficial association/alliance." Singamas Executive 2 told Singamas Executive 1, "I am generally fine with your ppt except on page 3, please delete 'alliance' as it is quite sensitive under anti-trust law."

   b.   In or around March 2022, a co-conspiring CIMC executive ("CIMC Executive 2") circulated to fellow CIMC co-conspirators—including TIANHUA HUANG and YONGBO WAN—a report by a then-U.S. Federal Maritime Commissioner and an excerpt from an interview of that commissioner. CIMC Executive 2 quoted a Chinese translation of the Commissioner's statement that "Chinese container manufacturing clearly took steps together to suppress the market prior to the pandemic. Those efforts resulted in part in the congestion issues and increases in containerized prices and magnified the issues created by congestion down the line. So they used their market power to control the market." In response, CIMC Chairman BOLIANG MAI instructed HUANG and WAN to pay close attention, but to neither respond nor discuss.

   c.   In or around March 2022, Singamas Executive 2 commented on a draft slide deck for SINGAMAS's upcoming announcement of its 2021 annual sales and manufacturing results presentation to investors. Singamas Executive 2 recommended to co-conspiring SINGAMAS executives that, for the topic of "market discipline, it is better not to put on the slide due to anti-trust issue."

   d.   In or around February 2023, Singamas Executive 3, explained that "each mainstream box manufacturing group jointly signed an agreement on the healthy and sustainable development of the industry, but the specific content of the agreement was kept confidential at a very high level and could not be found out. This agreement should currently be kept at the Head Office."

   e.   In or around March 2023, VICK MA prepared minutes of a March 2023 meeting between himself and co-conspiring SINGAMAS executives. At that meeting, Singamas Executive 2 "raised the concern about Anti-Trust violations" and was concerned that "there may be a risk of being sued by clients."

//
//
//
//

INDICTMENT                                        10

## STATUTORY ALLEGATIONS

### COUNT ONE
**Conspiracy in Restraint of Trade: Output Restriction and Price Fixing**
**15 U.S.C. § 1**

45. The General Allegations of this Indictment, including paragraphs 1 through 44, are re-alleged and fully incorporated herein by reference.

**Description of the Offense**

46. Beginning at least as early as November 2019 and continuing until at least as late as January 2024, the exact dates being unknown to the Grand Jury, in the Northern District of California and elsewhere,

CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD,
a/k/a 中国国际海运集装箱（集团）股份有限公司;
SINGAMAS CONTAINER HOLDINGS LTD., a/k/a 胜狮货柜企业有限公司;
CXIC GROUP CONTAINERS CO. LTD., a/k/a 新华昌集团有限公司;
SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD.,
a/k/a 上海寰宇物流装备有限公司, a/k/a "Dong Fang International Containers," a/k/a "DFIC";
BOLIANG MAI, a/k/a 麦伯良;
TIANHUA HUANG, a/k/a "T.H. Huang," a/k/a 黄田化;
YONGBO WAN, a/k/a 万永波;
QIANMIN LI, a/k/a 李前敏;
YUQIANG ZHANG, a/k/a "James Zhang," a/k/a 张钰强; and
VICK NAM HING MA, a/k/a "Vick Ma," a/k/a 馬南慶, a/k/a 马南庆,

the defendants, and others known and unknown to the Grand Jury, knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition—that is, to restrict the output of and fix the prices of standard dry shipping containers sold to customers worldwide, including in the Northern District of California.

47. The combination and conspiracy engaged in by the defendants and co-conspirators was a per se unlawful, and thus unreasonable, restraint of foreign and interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**Means, Methods, and Overt Acts of the Conspiracy**

48. For the purpose of forming and carrying out the charged combination and conspiracy, the defendants and co-conspirators did those things that they conspired to do, including, among other things:

a. participating in meetings, conversations, and communications concerning the output and prices of standard dry shipping containers to be sold in the United States and elsewhere;

b. agreeing to production-hour restrictions and production quotas at various factories controlled by the defendants and co-conspirators;

c. agreeing not to build additional factories for manufacturing standard dry shipping containers;

d. memorializing aspects of their conspiracy in the Moon Gazing Fund contract;

e. modifying and amending the precise manner and operation of the conspiracy over time;

f. collecting, exchanging, monitoring, auditing, and discussing information on output, prices, production levels, and production hours of standard dry shipping containers, including by installing video cameras at the company conspirators' factories and exchanging data about those companies' monthly production volumes;

g. maintaining and using a trade association, the China Container Industry Association ("CCIA"), to promote, facilitate, police, monitor, and conceal the combination and conspiracy;

h. directing employees and subordinates to coordinate with their co-conspirators concerning the implementation of production capacity restrictions through electronic messaging communications;

i. negotiating sales of collusively and noncompetitively priced standard dry shipping containers with customers located in the United States (including in the Northern District of California) and elsewhere;

j. selling collusively and noncompetitively priced standard dry shipping containers to customers located in the United States (including in the Northern District of California) and elsewhere;

k. accepting payment for collusively and noncompetitively priced standard dry shipping containers from customers located in the United States (including in the Northern District of California) and elsewhere;

l. agreeing to lower prices of certain containers to wage a price war against smaller, non-conspiring, container manufacturers; and

m. employing measures to conceal their conduct, including limiting distribution of documents reflecting conspiratorial agreements, meeting in person to discuss the conspiracy, and redacting references to the conspiracy from presentations and communications.

**Trade and Commerce**

49. The charged combination and conspiracy involved U.S. import trade or commerce. Specifically:

a. the company conspirators, aided and abetted by the individual defendants and individual co-conspirators, manufactured dry shipping containers in the People's Republic of China and sold them to customers located in the United States at collusive and noncompetitive prices.

b. It was closely connected with, and directed at, the importation of goods into the United States. Specifically, the charged combination and conspiracy affected domestic competition for imported goods in the United States by fixing a component of global shipping costs—that is, the price of standard dry shipping containers—paid by United States importers.

50. The charged combination and conspiracy also had a direct, substantial, and reasonably foreseeable effect on U.S. import trade or commerce, and that effect gives rise to this charge by operation of law. Specifically, the defendants and their co-conspirators agreed to raise prices and restrict output of standard dry shipping containers, which increased shipping costs paid by United States importers.

51. The charged combination and conspiracy had a direct, substantial, and reasonably foreseeable effect on domestic U.S. trade or commerce, and that effect gives rise to this charge by operation of law. Specifically, the defendants and their co-conspirators manufactured standard dry shipping containers in the People's Republic of China and sold them to customers located in the United States at collusive and noncompetitive prices; after the standard dry containers were shipped from the People's Republic of China to U.S. ports, the containers traveled in interstate trade and commerce to reach the U.S. customers who had purchased or leased them. In addition, substantial payments for such

INDICTMENT 13

production, purchase, and shipment of standard dry shipping containers traveled in interstate trade or commerce.

52. The charged combination and conspiracy had a direct, substantial, and reasonably foreseeable effect on U.S. export trade or commerce of persons engaged in such trade or commerce in the United States, and that effect gives rise to this charge by operation of law. During the period covered by this Indictment, the business activities of defendants and their co-conspirators in connection with the sale of standard dry shipping containers across the world, including into the United States, were within the flow of, and substantially affected, trade or commerce among the states and with foreign nations.

53. The charged combination and conspiracy had a substantial and intended effect in the United States, including on trade or commerce in standard dry shipping containers among the several states and with foreign nations. For example, the charged combination and conspiracy increased the price of standard dry shipping containers sold to customers located in the United States.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

### FORFEITURE ALLEGATIONS
### 15 U.S.C. §§ 6, 11, and 28 U.S.C. § 2461(c)

The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 15 U.S.C. § 6, 15 U.S.C. § 11, and 28 U.S.C. § 2461(c).

Upon conviction for the offense set forth in this Indictment, the defendants,

CHINA INTERNATIONAL MARINE CONTAINERS (GROUP) CO., LTD, a/k/a 中国国际海运集装箱（集团）股份有限公司;
SINGAMAS CONTAINER HOLDINGS LTD., a/k/a 胜狮货柜企业有限公司;
CXIC GROUP CONTAINERS CO. LTD., a/k/a 新华昌集团有限公司;
SHANGHAI UNIVERSAL LOGISTICS EQUIPMENT CO., LTD.,
a/k/a 上海寰宇物流装备有限公司, a/k/a "Dong Fang International Containers," a/k/a "DFIC";
BOLIANG MAI, a/k/a 麦伯良;
TIANHUA HUANG, a/k/a "T.H. Huang," a/k/a 黄田化;
YONGBO WAN, a/k/a 万永波;
QIANMIN LI, a/k/a 李前敏;
YUQIANG ZHANG, a/k/a "James Zhang," a/k/a 张钰强; and
VICK NAM HING MA, a/k/a "Vick Ma," a/k/a 馬南慶, a/k/a 马南庆,

INDICTMENT                                    14

shall forfeit to the United States, pursuant to 15 U.S.C. § 6, any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in 15 U.S.C. § 1, and being in the course of transportation from one State to another, or to a foreign country. In addition, upon conviction for the offense set forth in this Indictment, the defendants shall forfeit to the United States, pursuant to 15 U.S.C. § 11, any property owned under any contract or by any combination, or pursuant to any conspiracy, and being the subject thereof, mentioned in 15 U.S.C. § 8, imported into and being within the United States or being in the course of transportation from one State to another, or to or from a Territory or the District of Columbia.

If any of the property described above, as a result of any act or omission of the defendant:

      a.     cannot be located upon exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

ALL PURSUANT TO TITLE 15, UNITED STATES CODE, SECTION 6; TITLE 15, UNITED STATES CODE, SECTION 11; TITLE 28, UNITED STATES CODE, SECTION 2461(C); AND FEDERAL RULE OF CRIMINAL PROCEDURE 32.2.

//
//
//
//
//
//
//
//

DATED:

A TRUE BILL.

/s/
_____
FOREPERSON

_Abigail Slater_
ABIGAIL A. SLATER
Assistant Attorney General for the
Antitrust Division

_Omeed Assefi_
OMEED A. ASSEFI
Acting Deputy Assistant Attorney General

MATTHEW CHOU
ALBERT B. SAMBAT
DANIEL B. TWOMEY
Trial Attorneys

Antitrust Division
U.S. Department of Justice
San Francisco Office
450 Golden Gate Avenue, Suite 10-0101
San Francisco, California 94102
Tel: (415) 934-5300

CRAIG H. MISSAKIAN
United States Attorney for the
Northern District of California

INDICTMENT

16